IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

BNLFOOD INVESTMENT SARL,

      Plaintiff,

        v.               CIVIL NO.: WDQ-11-0446

MARTEK BIOSCIENCES CORP.,

      Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

BNLfood Investments Limited SARL[1] ("BNLfood") sued Martek

Biosciences Corporation ("Martek") for violations of Section 2

of the Sherman Act,[2] Section 3 of the Clayton Act,[3] and the

Maryland Antitrust Act.[4]  Pending is Martek's motion for summary

judgment.  For the following reasons, the motion will be

granted.

---

[1] The docket lists the plaintiff as "BNLfood Investment SARL."
The amended complaint and subsequent documents have named the
plaintiff as "BNLfood Investments Limited SARL."  *See also* Pl.
Ex. 26 at 78-79 (confirming identity and spelling).  The Clerk
of the Court will be directed to correct the docket accordingly.

[2] 15 U.S.C. § 2.

[3] 15 U.S.C. § 14.

[4] Md. Code Ann., Com. Law §§ 11-201 *et seq.*

I.   Background[5]

Martek is a biotechnology company whose products include fatty acids from microorganisms.[6]   Def. Ex. 9 at 2.   Martek sells docosahexaenoic acid ("DHA") derived from algae and arachidonic acid ("ARA") from fungus for use in infant formula.[7]   *Id.* Martek's DHA and ARA are separate products.   *See* Def. Ex. 9 at 2-3; Def. Ex. 10 at 91:19-25.   DHA and ARA assist in infant brain and eye development.   Def. Ex. 9 at 3.   The two compounds appear to work together for this development, although the proper ratio and exact mechanism are currently unknown.   *See, e.g.,* Pl. Ex. 166; Def. Ex. 4.

BNLfood is a holding company for a family of companies that produce food, chemicals, pharmaceuticals, and other products.[8]

---

[5] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor."   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

[6] On June 20, 2012, Martek was merged into DSM Nutritional Products, LLC.   ECF No. 62.   The Clerk of the Court will be directed to correct the docket to reflect this change.   For simplicity, the Court will refer to "Martek" throughout.

[7] Under the Food, Drug, and Cosmetic Act and implementing regulations, "infant formula" is a food for persons not more than 12 months old simulating or substituting for human milk. *See* 21 U.S.C. § 321(z); 21 C.F.R. § 105.3(e).

[8] Like the parties, the Court will generally use "BNLfood" generically to refer to the various related entities unless there is a specific reason to do otherwise.   *See generally* ECF Nos. 78, 82.   The holding company will be referred to as "BNLfood SARL."

*See* Def. Ex. 25 at 207:1-16; Def. Ex. 26 at 79:15-21.  The Lipid

Company is the BNLfood subsidiary responsible for phospholipid

products, including DHA and ARA from eggs.  *See* Def. Ex. 26 at

169:16-24.  DHA and ARA cannot be separated in BNLfood's

products.  Def. Ex. 3 at 59:21-22.

A.    Martek's Sales of DHA and ARA

Since 2005 Martek has maintained a nearly 100% market share

of the DHA and ARA used in infant formula in the United States

by supplying four infant formula manufacturers: Mead Johnson &

Company ("Mead"), Abbott Laboratories ("Abbot"), Nestle, Ltd.

("Nestle"), and PBM Products, LLC ("PBM").  *See, e.g.,* Pl. Ex. 1

at 88:7-21; Pl. Ex. 5-7 (agreements).  In 2011, Mead had

approximately 45% of the U.S. market for infant formula, Abbott

24%, Nestle 21%, and PBM most of the rest; Martek supplied all

of their DHA and ARA.  *See* Def. Ex. 5; Def. Ex. 10 at 86:15-

87:1.

In 2002, Mead was the first manufacturer to offer infant

formula with DHA and ARA in the United States, using Martek's

products.  Pl. Ex. at 50:24-51:10.  Although the other

manufacturers make products under their own names, PBM makes

generic store brand products for various retailers.  *See* Def.

Ex. 10 at 86:21-23.

3

At some point,[9] Martek notified Mead of a price increase to occur during the fall of 2005.  Pl. Ex. 14 at MTK-E-0051186. Effective January 1, 2006, Martek and Mead executed a sole source agreement ("SSA"), where Mead agreed to purchase all of its required DHA and ARA for use in infant formula from Martek. Pl. Ex. 13.  According to Martek documents, "Mead signed its supply agreement with the expectation that Martek was increasing price."  Pl. Ex. 14 at MTK-E-0051186.  Martek's focus then shifted to "locking-up Martek's other major customers."   Pl. Ex. 10 at MTK0006160.

In April and May 2007, Martek notified its other customers that it was going to increase it prices for DHA and ARA effective July 1, 2007.[10]  Pl. Ex. 17.  In October 2007, Abbott signed an SSA with Martek, retroactive to January 1, 2007.  Pl. Ex. 18.  Nestle and PBM did not agree to SSAs, and Martek increased their prices.  See Pl. Ex. 21 at MTK-E-0096778; Pl. Ex. 24; Pl. Ex. 138.  To avoid another price increase, PBM signed a new license and supply agreement in September 2009. See Pl. Exs. 27-29.  This agreement, although not an SSA, gave PBM pricing options with (A) Martek as the sole source of both DHA and ARA or (B) Martek as the sole source of either DHA or ARA.  Pl. Ex. 142 at MTK0004238.

---

[9] The date is not in the record.

[10] The increases varied among the customers.  See Pl. Ex. 17.

Under Martek's original SSAs, Mead and Abbott could terminate the sole-source provisions effective December 31, 2011, which coincided with the expiration of some of Martek's patents. *See* Pl. Ex. 30 at MTK-E-0080062.  In 2009, Cargill, a producer of ARA but not DHA, was looking to begin selling ARA to the infant formula manufacturers. *See, e.g.*, Def. Ex. 8 at 75:14-76:12.  Facing the possibility of other suppliers entering the market, Martek devised pricing projections showing that it would be able to keep prices higher by arranging for SSAs with infant formula manufacturers. *See* Pl. Ex. 58 at MTK0020719. Although Cargill made overtures to Mead about the sale of ARA, Mead was worried about the price and availability of DHA from Martek, the only supplier. *See* Pl. Ex. 34; Pl. Ex. 35 at 84:3-8.  By June 2010, Mead amended its SSA with Martek, effective through the end of 2015.  Pl. Ex. 36.  Although the price declined each year, the 2015 ARA price was still higher than that offered by Cargill in 2009.  Pl. Ex. 4 at 71:9-14.  Martek believed that the Mead extension would "establish[] a template and pricing model for negotiations with our other customers." Pl. Ex. 31 at MTK0020789.  Ethan Leonard, a Martek employee, testified that Mead effectively got a discount through the stable price of the SSA because of inflation.  Def. Ex. 10 at 57:22-58:1.  However, Martek documents indicated that Mead could have saved $9 million "on a net present value basis" by

switching to competitors after the expiration of the original
SSA.  Pl. Ex. 31 at MTK0020789.

On December 16, 2010, Abbott also extended its SSA with
Martek through 2016.  Def. Ex. 23.  Martek then looked to
execute an SSA with PBM, believing if PBM "were to move to an
alternative DHA/ARA supplier in the U.S., then it would improve
the likelihood that Mead, Abbott or Nestle would do the same
when contractually permitted."  Pl. Ex. 43 at MTK-E-0070466.
After being pressured about the need to maintain the same
formulations as the market leaders, PBM agreed to an SSA
effective December 1, 2011.  See Pl. Ex. 15; Pl. Ex. 48.

Currently, Nestle is the only one of the four U.S. infant
formula manufacturers without an SSA with Martek, although there
have been some negotiations about such an agreement.  See, e.g.,
Pl. Ex. 56.  Nestle's current agreement with Martek contains
several pricing options, with considerably higher prices if
Nestle does not purchase all of its DHA and ARA from Martek.
See Pl. Ex. 6 at 34.

Martek attributes the SSAs with permitting it to develop a
new strain of DHA.  Def. Ex. 10 at 262:7-9.  Mark Dunaway, a
Martek employee, testified that the SSAs allowed Martek to have
assumptions about the quantity of DHA and ARA that it would
sell.  Def. Ex. 11 at 138:19-23.  Another, Peter Nitze,
testified that the SSAs did not make the supply more

6

predictable, and Martek did not expect it to.   Pl. Ex. 9 at
88:2-12.   Additionally, Martek's 2010 Form 10-K stated, "We have
limited visibility into our customers' future actual level of
demand."   Def. Ex. 9 at 23.

B.   BNLfood and the Infant Formula Market

BNLfood first tried to market its DHA and ARA products in
the United States around 2000, with greater effort from 2004 to
2009.   Def. Ex. 29 ¶ 4.   To assist its efforts, BNLfood retained
Michael Hawes as its agent in the United States.   *See* Def. Ex.
26 at 55:14-24.

In 2007, BNLfood decided to build a new facility for the
production of DHA and ARA for big markets, such as the United
States.   Def. Ex. 3 at 127:8-15.   By March 2010 the plant was in
operation for testing, although orders for customers were not
delivered until July 2011.   *See* Def. Ex. 26 at 71:19-22; Def.
Ex. 33 at 84:13-16

In anticipation of its new production capacity, BNLfood
began discussions with the four U.S. infant formula
manufacturers for sale of its DHA and ARA products.   On November
9, 2009, BNLfood representatives met with Mead personnel;
however, the Mead employees present "were in general agreement
that the DHA and ARA products marketed by [BNLfood] did not
merit further evaluation or consideration by [Mead] at the
time."   Def. Ex. 6 ¶ 6.   Mead was concerned because BNLfood's

7

products were derived from eggs, an allergen, and additional clinical testing would be required. *Id.* On March 9, 2010, a Mead employee who was not at the meeting emailed BNLfood that its products "might have our interest and should be evaluated against our business strategy." Pl. Ex. 69. On May 28, 2010, Hawes reported that Mead was "currently reviewing their policy" on DHA and ARA products "as the rules from end 2011 (*sic*) will differ with expiration of patent Martek (*sic*)." Pl. Ex. 65. Mead apparently had no further contact with BNLfood. Pl. Ex. 70 at 31:16-311:15.

BNLfood's negotiations with Abbott in 2009 and 2010, were similarly unproductive. In August 2009, Hawes reported that an Abbott employee disclosed the SSA with Martek. Def. Ex. 42. Although negotiations appear to have continued, on December 9, 2009, an Abbott representative stated "[a]t this time, we are not interested in working with [BNLfood] in regards to GRAS[11] status for [BNLfood's] lipid ingredient. Due to the investment required to add [BNLfood's] ingredient to our products, this

---

[11] GRAS is an acronym for "Generally Recognized as Safe." Recognition as GRAS, or approval as a food additive, is required before an ingredient may be added to infant formula. *See* Def. Ex. 15 at 19:10-22. There are two ways in which a product can be GRAS. First, the manufacturers can submit data to the Food and Drug Administration ("FDA") for review. *Id.* at 20:7-12. Second, the manufacturer can undertake the same tests but submit the data to the FDA only if challenged. *Id.* at 20:16-21:1. Generally, the GRAS process involves an expert panel determining the safety of the ingredient. *Id.* at 39:9-12.

opportunity was ranked a lower priority than other products at this time." Pl. Ex. 110. BNLfood and Abbott last met in January 2010, apparently without success. *See* Def. Ex. 7. There were no further negotiations between BNLfood and Abbott.

BNLfood also had no success with PBM. Although BNLfood and PBM were engaged in active discussions, at a October 14, 2010 conference call, PBM stated that BNLfood's price "was a deal breaker as it was 3 to 5 times more expensive" than Martek's. Def. Ex. 57. PBM was also concerned about the progress of BNLfood's GRAS submission. *See* Def. Ex. 49. Nevertheless, PBM requested samples from BNLfood, which were provided in November 2010. *See* Pl. Ex. 79; Pl. Ex. 80. On June 13, 2011, PBM requested additional samples for evaluations and trials. Pl. Ex. 82. It appears that BNLfood had no further contact with PBM.

Nestle has long been a customer of BNLfood in Europe, and BNLfood sought to expand their relationship to the United States. *See* Pl. Ex. 83 at 43:16-44:6. In early June 2009, Hawes spoke to a new Nestle representative who stated that it would be difficult doing business with BNLfood in the United States "because they have a contract with Martek through 2012 which is very strong." Pl. Ex. 66. On June 22, 2009, Nestle expressed interest in BNLfood's DHA and ARA products "especially about any available phospholipid-DHA formulations targeted at

9

the infant formula market." Pl. Ex. 87.  On November 11, 2009,

Nestle expressed interest in BNLfood's being a supplier for ARA.

Pl. Ex. 92.  Although Nestle appeared to prefer pure ARA, which

BNLfood does not offer, Nestle "would consider also the presence

of DHA because DHA would be part also of the mix."  *See id.*

Also in November 2009, Nestle representatives met with

Hawes in the United States; Nestle received samples from BNLfood

in March 2010.  Pl. Ex. 95.  In 2010, BNLfood believed that for

Nestle's business, it would need clinical studies and to address

the egg-based allergy issue.  *See* Def. Ex. 46 at BNL0028005.  By

November 2010, Nestle experts had evaluated BNLfood's DHA and

ARA products and gave a "positive opinion for applications in

products."  Pl. Ex. 86 at BNL0006642.  However, the only Nestle

unit interested was a dairy business in China.  *Id.*  BNLfood has

no further contact with Nestle in the United States.  *See* Pl.

Ex. 97 at 374:13-15.

In December 2011, BNLfood submitted its GRAS notification

to the FDA for its DHA and ARA products.  Def. Ex. 15 at 40:8-9.

On March 16, 2012, and June 8, 2012, the FDA sent BNLfood

questions about its notification, which BNLfood duly answered.

Def. Ex. 4; Def. Ex. 16.  On November 20, 2012, the FDA sent

BNLfood a "No Questions" Letter about its GRAS notice.  ECF No.

86-1.

C.    Relations Between BNLfood and Martek

In January 2007, BNLfood sought to purchase ARA for use in chicken feed to help produce eggs with the correct amounts of ARA and DHA. *See* Pl. Ex. 98 at MTK-E-0014859. Explaining that Martek did not sell ARA for "animal applications," a Martek representative denied the request. *Id.* at MTK-E-0014858. Martek later clarified that the use of its ARA in infant formula required a license to the formula manufacturer, and thus it could not sell ARA through distributors. *Id.* It also stated that the end use of BNLfood's products in infant formula would compete with Martek's business, and "[i]t is not in our interest to further the acceptance of egg phospholipid as an alternative ARA ingredient." *Id.*

In April 2009, Martek employees were planning to visit a trade show where competitors, including BNLfood, would be exhibitors. Pl. Ex. 103. Although the discussions listed BNLfood as one of the vendors, Martek employees did not have any specific plans for it. *See id.* At the show, Martek employees obtained BNLfood literature. *See* Pl. Ex. 104.

In June 2009, Martek employees visited BNLfood and decided to "make an assessment of what sort of threat this is." *Id.* There was apparently no further investigation.

BNLfood was also examining its competition with Martek. The minutes of BNLfood's December 21, 2010 board meeting

examined Martek's pricing strategy as a "dumping practice" because Martek sold "at a loss in real cost to exclude its competitors from the market." Def. Ex. 50A at BNL0037619 (certified translation of Def. Ex. 50). However, BNLfood also indicated that the price of oils like those produced by Martek was in decline due to pressure from Cargill and Chinese manufacturers. Def. Ex. 54 at BNL0006726.

D.   Procedural History

On February 17, 2011, BNLfood filed suit seeking treble damages, a permanent injunction, and attorneys' fees for violations of § 2 of the Sherman Act, § 3 of the Clayton Act, and the Maryland Antitrust Act. ECF No. 1. On May 5, 2011, it amended the complaint. ECF No. 12. On August 10, 2012, Martek moved for summary judgment. On September 10, 2012, BNLfood opposed. ECF No. 82. On September 28, 2012, Martek replied, ECF No. 84.

II.   Analysis

A.   Legal Standard

Under Fed. R. Civ. P. 56(a), summary judgment "shall [be] grant[ed]   . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[12]   In

---

[12] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine

considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted).

B.   Martek's Motion

Martek asserts that it is entitled to summary judgment because its agreements are not anticompetitive, and BNLfood lacks standing. ECF No. 78-1.

---

'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

1.    Antitrust Claims

Martek asserts that it is entitled to summary judgment because (1) BNLfood has failed to provide evidence of the relevant product market, (2) Martek does not possess market power, and (3) Martek's actions were not anticompetitive under the Rule of Reason.[13] ECF No. 78-1 at 30. Exclusive dealing arrangements are not *per se* antitrust violations. *Chuck's Feed & Seed Co., v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987). For exclusive dealing to violate § 3 of the Clayton Act, (1) the line of commerce must be identified, (2) "the area of effective competition in the known line of commerce must be charted," and (3) "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961); *see Chuck's Feed & Seed*, 810 F.2d at 1293.

---

[13] Martek generally asserts these arguments under the broader test of § 3 of the Clayton Act which requires a contract for the violation; § 2 of the Sherman Act requires willful maintenance of a monopoly, but no contract. *See* ECF No. 78-1-1 at 31 n.26; *see also* 15 U.S.C. §§ 2, 14; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Cavalier Telephone, LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003).

Additionally, interpretation of Maryland antitrust law is "guided" by the interpretation of the analogous federal statute. *See* Md. Code Ann., Com. Law § 11-202(a)(2); *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 666 (Md. 1984). Accordingly, only one analysis is necessary.

a.   Product Market

Martek asserts that BNLfood has failed to prove the relevant product market.   ECF No. 78-1 at 31.   BNLfood asserts that Martek's reading of the complaint and evidence is incorrect, and, even if Martek is correct, there is a genuine dispute of material fact.   ECF No. 82 at 12.

In examining an alleged antitrust violation, the Court "must first define the relevant market because the concept of competition has no meaning outside its own arena."   *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983); *see Berlyn Inc. v. Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003). "A relevant product market is composed of products that have reasonable interchangeability for the purposes for which they are produced."   *Berlyn*, 73 F. App'x 576 (*quoting United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 404 (1956)).

BNLfood alleges that "[t]he relevant product and geographic markets . . . are the manufacture and sale of DHA and ARA nutritional ingredients for use in infant formula in the United States."[14]   ECF No. 12 ¶ 23.

Martek interprets the complaint as alleging a single product market for the manufacture and sale of DHA and ARA for

---

[14] Although Martek "does not agree with the geographic market pled in the Amended Complaint," it has not presented any argument against it.   *See* ECF No. 78-1-1 at 31 n.28.

use in infant formula.  ECF No. 78-1 at 31.  It contends this interpretation excludes resellers, companies that make their own DHA and ARA but do not sell to others, and product given away for testing purposes from the relevant product market.  *Id*. at 32.

Despite Martek's argument, under the interchangeability test there is no reason for the market to exclude resellers of DHA and ARA.  There is no evidence that DHA and ARA that has been resold differ from BNLfood's DHA and ARA--nor does Martek argue such.  Despite arguably unclear pleading by BNLfood, under the interchangeability rule, a reasonable jury could find that resellers are included in BNLfood's definition.  *See DuPont*, 351 U.S. at 404; Def. Ex. 2 at 134:6-20.  Similarly, manufacturers of infant formula who make their own DHA and ARA or distribute the phospholipids without change can be found to be included in the market.  *See Berlyn*, 73 F. App'x at 852-53 (adjusting analysis of market to the relevant consumer when improperly pled and argued).  Martek's argument about BNLfood's description of the alleged market is too restrictive--its focus should be on the realities and operations of that market.  *See id.*  Martek has not shown any fatal deficiencies in BNLfood's definition of

the relevant market, and a reasonable jury could agree with that definition.[15]

b.   Market Power

Martek next asserts that the evidence shows that it does not have market power.  ECF No. 78-1 at 32.  BNLfood asserts that the evidence shows that Martek has, and abuses, monopoly power.[16]  ECF No. 82 at 15.

---

[15] In its reply memorandum, Martek raises a new argument that DHA and ARA are not actually interchangeable to be part of the same market.  See ECF No. 84 at 21-22.  Although DHA and ARA can be sold separately, as Martek does, there is evidence that the two compounds work together to have beneficial developmental effects.  See Pl. Ex. 166 (scientific study); Def. Ex. 4 (FDA noting that [t]he ratio of ARA to DHA, although not entirely understood is considered to be nutritionally important.").  Because of this uncertainty as to the exact interaction between and interdependence of DHA and ARA, a reasonable jury could conclude that they are part of the same market.  See Def. Ex. 2 at 133:7-10 ("What's relevant is the market for the bundle that includes both.").

[16] Although Martek frames the inquiry in terms of "market power," the cases it cites concern *monopoly* power.  See ECF No. 78-1-1 at 32.  Section 2 of the Sherman Act prohibits, *inter alia*, actual monopolies, which BNLfood alleges that Martek has.  See ECF No. 12 ¶ 53.  In contrast, § 3 of the Clayton Act prohibits the "probable effect" of the foreclosure of competition.  See *Microsoft*, 253 F.3d 34, 69 (D.C. Cir. 2001) (*citing Tampa Electric*, 365 U.S. at 327).  Some courts have applied the same test of market foreclosure to claims under § 1 of the Sherman Act and § 3 of the Clayton Act.  See, e.g. *Roland Mach. Co. v. Dresser Indus., Inc.* 749 F.2d 380, 393 (7th Cir. 1984) (Posner, J.).  But see e.g., *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir. 1992) (holding that § 3 of the Clayton Act imposes a "more rigorous standard[]").  "Monopoly power under § 2 requires, of course, something greater than market power under § 1."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992).  But cf. *Microsoft*, 253 F.3d at 70 (positing that in certain circumstances, a monopolist's

17

Monopoly power in a market is "the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "Although the 'existence of [monopoly] power ordinarily may be inferred from the predominant share of the market' . . . because of the possibility of competition from new entrants, looking to current market share can be 'misleading.'"[17]

There is no dispute that Martek controls nearly 100% of the current market for DHA and ARA in infant formula and currently has SSAs with three of the four primary distributors.[18]  This is

---

contracts could violate § 2 but not § 1).  Even if § 3 of the Clayton Act and § 1 of the Sherman Act are not analyzed under the same standard, § 3's probable effect test means that the showing of power requires a lesser showing than a current monopoly under § 2.  *See Tampa Electric.*, 365 U.S. at 328 ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.").  Despite Martek's framing of its market power as monopoly power, it expressly states that it was engaging in a Clayton Act analysis, rather than the stricter Sherman Act analysis.  ECF No. 78-1 at 31 n.27.  Because there is sufficient evidence for a reasonable jury to find that Martek has a monopoly, the Court need not analyze the differing standards.

[17] *United States v. Microsoft Corp.*, 253 F.3d at 54 (*quoting United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980); *citing Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)).

[18] Martek asserts that even a 100% market share does not mean a monopoly, citing *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993).  ECF No. 84 at 22.  In that case, however, two competitors withdrew from the market--one after a fire--and there was no evidence of control of the market. *See id* at 1425-26, 1429.

more than sufficient to raise an inference of monopolization.
*See E.I. duPont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d
435, 450 (4th Cir. 2011).  Further, Martek's SSAs with the
majority of the sellers in the marketplace indicate an attempt
to control the market in the future.  *See Ball Mem'l Hosps. v.
Mut. Hosp.*, 784 F.2d 1325, 1336.

Martek asserts that BNLfood's own board indicated that
"Martek's pricing was *too low*."  ECF No. 78-1 at 34 (emphasis in
original).  The Board minutes on which Martek relied indicate
that "Martek policy translates actually to a dumping practice .
. . it sells at a loss in real cost to exclude its competitors
from the market."  Def. Ex. 52A at BNL0037619.  Martek supports
this assertion with BNLfood's business strategy document that
indicated that prices for ARA and DHA "remain in decline *due to
competition* (Cargill, Chinese players)."  ECF No. 78-1 at 34
(*quoting* Def. Ex. 54 BNL0006726 (emphasis added)).  Dumping at a
lower price is generally an unsuccessful strategy to obtain or
maintain a monopoly. *See Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp.*, 475 U.S. 574, 591 (1986).

However, there is also evidence to the contrary.  Martek's
projections show that it would be able to sell the DHA and ARA
at a greater price through the SSAs than the market would
otherwise support.  *See* Pl. Ex. 58 at MTK0020719.  Further,
during the SSA renegotiations, Cargill offered U.S. competition

19

only for ARA; Martek remained the sole supplier of DHA. *See* Pl.
Ex. 34. Meade was concerned that Martek would be able restrict
the availability and price of its DHA. *See id.*; Pl. Ex. 35 at
84:3-8. Accordingly, there is a genuine dispute of material
fact of whether Martek was actually able to control prices.

Additionally, the SSAs by design excluded competition.
Although, Nestle has not had an SSA with Martek, Martek's SSAs
with the other three manufacturers made it the sole source for
DHA and ARA in over 70% of the market. This could support a
jury finding of monopoly power.

BNLfood, and other potential competitors, also face
significant entry barriers to the market. Potential entry
barriers are (1) licensure and regulatory requirements, (2)
"control of an essential or superior resource," (3) "entrenched
buyer preference", (4) capital markets imposing higher costs,
and (5) economies of scale. *W. Parcel v. United Parcel Serv. of
Am., Inc.*, 190 F.3d 974, 975 (9th Cir. 1999) (internal quotation
marks omitted).[19] Any DHA and ARA used in infant formula must

_____

[19] Martek's reading of *Western Parcel Express* is far too
restrictive. Martek asserts that *Western Parcel Express* stated
that entry barriers are only "additional long-run costs that
were not incurred by incumbent firms but must be incurred by new
entrants" and Martek was not free of any regulatory hurdles that
BNLfood must overcome. ECF No. 84 at 24 (*quoting W. Parcel
Express*, 190 F.3d at 975). However, *Western Parcel Express* made
clear that the long-run costs were only one form of entry
barrier; another is "factors in the market that deter entry
while permitting incumbent firms to earn market returns." *W.*

first be GRAS, and the manufacturer of the formula must make certain assurances to the FDA before the formula may be marketed. *See* 21 U.S.C. § 350a(d). Any new entrant also faces an extreme form of entrenched buyer preference: the SSAs for Martek's forms of DHA and ARA. From Martek's market share, control of prices, and exclusion of competition through SSAs and entry barriers, a reasonable jury could find that Martek has monopoly power.

### c.   Rule of Reason

Martek next argues that its SSAs are procompetitive under the "rule of reason" and thus it is not subject to antitrust liability. ECF No. 78-1 at 34.

Under the rule of reason, the Court "must consider whether there are any procompetitive justifications for the use of the particular vertical restriction at issue."[20] *Chuck's Feed & Seed*, 810 F.2d at 1294 (*citing Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 353 (1982)). Although the rule of reason is originally a doctrine for § 1 of the Sherman Act, courts have

---

*Parcel Express*, 190 F.3d at 975. The court then listed the above factors. *Id.*

[20] "A 'vertical' restriction is one that is embodied in an agreement between a seller and a purchaser of a product, and which restricts the activities of the purchaser with respect to third parties." *Chuck's Feed & Seed*, 810 F.2d at 1294 n. 2. "By contrast, a 'horizontal' restriction involves agreements between competing sellers or competing buyers." *Id.*

applied it to both § 2 and Clayton Act exclusive dealing cases. *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (exclusive dealing); *Microsoft*, 253 F.3d at 59 (section 2).

Martek asserts that its SSAs are procompetitive because it can offer its customers lower prices, "leading ultimately to lower consumer prices for infant formula at the retail level." ECF No. 78-1 at 35.   There is genuine dispute about whether the SSAs gave customers lower prices on DHA and ARA.   Leonard testified that Mead Johnson got a "discount" because the SSAs locked in a price and were not subject to inflation.   Def. Ex. 10 at 57:22-25.   On the other hand, Martek's internal documents stated that Martek would have to make initial price concessions to maintain higher prices after the initial SSAs expired.[21] Accordingly, there is a genuine dispute of material fact about whether the SSAs actually lowered prices in the long term and the effect of that pricing.[22]

---

[21] *See* Pl. Ex. 31 at MTK0020789 ("Mead would save approximately $9 million by switching to competitors on a net present value basis," based on an SSA until 2013); *id.* at MTK0020793 ("Hold now, will likely have to take deeper cuts later."); Pl. Ex. 58 at MTK0020719 (predicting significantly higher prices over time with SSAs in place than without).

[22] Further, there is no actual evidence of lower consumer prices, other than Martek expert's interpolation from Martek's negotiations with the formula manufacturers.   Def. Ex 73 at 61:16-25.

Next, Martek contends that the SSAs "provide Martek with revenue security to permit investments in capital, research and development, and other potential product or business lines." ECF No. 78-1 at 36.   Although Martek cites several depositions about Martek having security and pursuing various investments, the only specific item referenced is work on a single improved DHA strain.   Def. Ex. 10 at 262:7-9.

Martek also asserts that the SSAs gave it and its customers certainty to supply volumes.   ECF No. 78-1 at 36.   The SSAs do not contain quantity terms.   Dunaway testified that Martek was able to make assumptions about the quantity that its customers would purchase "based on how the overall global infant formula markets are going."   Def. Ex. 11 at 138:19-23.   However, Nitze testified that the SSAs did not make the supply more predictable, and Martek did not expect it to.   Pl. Ex. 9 at 88:2-12; see also Def. Ex. 9 at 23 (Form 10-K)("We have limited visibility into our customers' future actual level of demand."). Accordingly, there is a dispute about the certainty of Martek's future sales volumes.

Finally, Martek asserts that the SSAs allow it to focus on the safety of its products.   ECF No. 78-1 at 36.   Although it cites evidence about the importance of safety, it has not shown that the agreements allow it to focus more on safety than it

23

otherwise would. *Cf., e.g.*, Def. Ex. 11 at 71:12-21 (discussing importance of safety).

Genuine disputes of material fact remain about Martek's asserted procompetive behavior in entering to the SSAs. It has not shown that it is entitled to judgment as a matter of law under the rule of reason.

### 2. Antitrust Standing

Martek also asserts that BNLfood lacks antitrust standing. ECF No. 78-1 at 37. "In a private antitrust action, a plaintiff must go beyond a showing that it meets the Article III standing requirements of injury, causation, and redressability; it must also demonstrate 'antitrust standing.'" *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007). In deciding whether a plaintiff has antitrust standing, a court must consider five factors:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Id.* at 311. The first two factors encompass "antitrust injury"; they "ensure that the plaintiff claims the proper *type* of injury." *Id.* at 311, 315. The other three factors, which weigh

24

the "directness or remoteness of the plaintiff's alleged

antitrust injury," may "further constrict the number of private

plaintiffs" who may sue. *Id.*  The antitrust laws protect not

only consumers and competitors, but all victims of prohibited

practices.  *See Mandeville Island Farms, Inc. v. Am. Crystal*

*Sugar Co.*, 334 U.S. 219, 236 (1948).

. Martek specifically argues that BNLfood cannot establish

that (1) it is sufficiently prepared to enter the U.S. market,

(2) Martek harmed competition, and (3) Martek harmed BNLfood.

ECF No. 78-1 at 38-48.

    a.   BNLfood's Preparation to Enter the Market

Martek asserts that BNLfood is unprepared to enter the

market.  ECF No. 78-1 at 46.  BNLfood asserts that the evidence

shows that it is prepared.  ECF No. 82 at 41.

A defendant's potential competitor may bring an antitrust

action if it can show genuine intent and preparedness to enter

the relevant market.[23]  A plaintiff may show this through its

background and experience in the field, financial ability to

---

[23] *See, e.g., Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d
799, 807 (D.C. Cir. 2001); *Gas Utils. Co. of Ala., Inc. v. S.*
*Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (per
curiam); *Bupar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir.
1985); *Grip-Pak, Inc. v. Ill. Tool Works, Inc.*, 694 F.2d 466,
475 (7th Cir. 1983); *Huron Valley Hosp., Inc. v. City of*
*Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981); *Martin v. Phillips*
*Petroleum Co.*, 365 F.2d 629, 633 (5th Cir. 1966).

enter the market, relevant contracts, and acquisition of necessary facilities and equipment.[24]

Martek's first evidence of BNLfood's lack of preparation is its lack of GRAS status. ECF No. 78-1 at 46. After briefing was completed, the FDA issued a no questions letter, accepting BNLfood's GRAS notification. *See* ECF No. 86-1. Martek asserts that BNLfood still faces the regulatory hurdles before it can sell its products. ECF No. 87.

Under the Food, Drug, and Cosmetic Act, manufacturers of infant formula must assure the FDA that, *inter alia*, the formula provides the proper nutrients and is manufactured to prevent adulteration. *See* 21 U.S.C. § 350a. The FDA has proposed rules for the manufacture of infant formula, but they have never gone into effect. *See* 61 Fed. Reg. 36154. Clinical trials are included in the proposed regulations, but are not currently required. *See* Proposed 21 C.F.R. § 106.97(a), 61 Fed. Reg. 36215; Def. Ex. 68. Further, BNLfood is not prohibited from selling DHA and ARA to manufacturers for use in formula; it is the manufacturers who may not introduce the formula into commerce without providing the proper materials to the FDA, including GRAS status. *See* 21 U.S.C. § 350a(d); Def. Ex. 15 at

---

[24] *Bupar,* 752 F.2d at 452; *Curtis v. Campbell-Taggart, Inc.,* 687 F.2d 336, 338 (10th Cir. 1982); *Huron Valley Hosp., Inc.,* 666 F.2d at 1033; *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 994 (D.C. Cir. 1977).

18-21.  As Martek concedes that BNLfood may work with manufacturers who have SSAs with Martek to engage in clinical studies or other regulatory work necessary to comply with FDA procedures, *see, e.g.*, ECF No. 87, a reasonable jury could find this indicates preparation to enter the market at the end of Martek's original SSAs.[25]  *See Hecht*, 570 F.2d at 987-88.

> b.   Harm to Competition

Martek asserts that BNLfood cannot establish that Martek's agreements have harmed competition.  ECF No. 78-1 at 43. BNLfood asserts that the evidence shows that it does.  ECF No. 82 at 38.

Martek has SSAs with three of major infant formula manufacturers, and its contract with the fourth discourages using other suppliers.  Violations of § 3 of the Clayton Act occur when a contract forecloses competition in "a substantial share of the relevant market."  *Tampa Electric*, 365 U.S. 328. Under the SSAs, the market is essentially locked up, prohibiting any competition until their expiration.  Under *Tampa Electric*, this is harm to the market "of the type the antitrust laws were intended to prevent."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see supra* Part II.B.1.

---

[25] Martek does not appear to dispute other indicia of BNLfood's preparedness to enter the market.  *See* ECF No. 78-1-1 at 46 & n.36.  For example, BNLfood has constructed a new plant, and executed nondisclosure agreements with potential clients.  *See* Pl. Ex. 150 ¶ 5; Pl. Ex. 153.

c.    Harm to BNLfood

Finally, Martek argues that BNLfood cannot establish that the antitrust violations caused BNLfood harm.  ECF No. 78-1 at 38.  BNLfood contends that its evidence at least creates a genuine dispute of material fact about its harm.  ECF No. 82 at 23.

To recover, BNLfood's harm must "flow[] from the exclusive supply agreement[s],"[26] which are "substantial or materially contributing factor[s]" in its injury.[27]  Although the fact of harm "must be established with 'a fair degree of certainty,'"[28] "a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury."[29]

Causation may be proved by circumstantial or direct evidence.  *Zenith*, 395 U.S. at 125.  "However, evidence that is merely speculative will not satisfy this burden."  *Microbix*, 172

---

[26] *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 697 (D. Md. 2000); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[27] *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245 (2d Cir. 1992) (internal quotation marks omitted).

[28] *Microbix*, 172 F. Supp. 2d at 697 (*quoting Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir. 1974)).

[29] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

F. Supp. 2d at 699 (*citing Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986)).

The only evidence supporting an inference that BNLfood was injured by Martek's SSA with Mead is speculative.  Following a meeting on November 9, 2009, Mead employees "were in general agreement that the DHA and ARA products marketed by [BNLfood] did not merit further evaluation or consideration by [Mead] at the time."  Def. Ex. 6 ¶ 6.  An individual who was not at the meeting stated on March 9, 2010, that products like BNLfood's "might have our interest and should be evaluated against our business strategy."  Pl. Ex. 69.  On May 28, 2010, Hawes reported that Mead was "currently reviewing their policy" on DHA and ARA products "as the rules from end 2011 (*sic*) will differ with expiration of patent Martek (*sic*)."  Pl. Ex. 65.  Mead extended its SSA one month later, and BNLfood had no further contact.  Pl. Ex. 70 at 31:16-311:15.  From this evidence, it is no more than speculative that Martek's anticompetitive conduct was a material factor in BNLfood's harm.

Similarly, there is no evidence that Abbott was seriously considering BNLfood's DHA and ARA products.  On December 9, 2009, an Abbott representative stated "[a]t this time, we are not interested in working with [BNLfood] in regards to GRAS status for [BNLfood's] lipid ingredient.  Due to the investment required to add [BNLfood's] ingredient to our products, this

29

opportunity was ranked a lower priority than other products at
this time." Pl. Ex. 110. One last meeting in early 2010 was
apparently unproductive. *See* Def. Ex. 7. In December 2010, and
without further discussions with BNLfood, Abbott extended its
SSA with Martek. *See* Def. Ex. 23. Other than BNLfood's agent
reporting that before the extension he had learned of Abbott's
original SSA from an Abbott employee, there is nothing
connecting BNLfood's failure with Abbott to Martek's conduct.
*See* Def. Ex. 42. BNLfood has not shown more than a speculative
connection between Martek and its injury.

Unlike Mead and Abbott, PBM did not have an SSA with Martek
until after its discussions with BNLfood. After a request from
PBM, BNLfood provided samples in November 2010. *See* Pl. Ex. 79;
Pl. Ex. 80. On June 13, 2011, PBM requested additional samples
for evaluations and trials. Pl. Ex. 82. It appears that PBM
signed its SSA with Martek without further contact with BNLfood.
*See* Pl. Ex. 48. Harm from PBM's contract is also speculative.

Nestle has long been a customer of BNLfood in Europe. Pl.
Ex. 83 at 43:16-44:6. In early June 2009, Hawes spoke to a new
Nestle representative who stated that it would be difficult
doing business with BNLfood in the United States "because they
have a contract with Martek through 2012 which is very strong."[30]

---

[30] Martek attempts to undermine Hawes's credibility on this point
by pointing out that Hawes later retreated from some of his

Pl. Ex. 66.  On June 22, 2009, Nestle expressed interest in BNLfood's DHA and ARA products "especially about any available phospholipid-DHA formulations targeted at the infant formula market."[31]  Pl. Ex. 87.  On November 11, 2009, Nestle expressed interest in BNLfood's being a supplier for ARA.  Pl. Ex. 92.  Although Nestle appeared to have preferred pure ARA, which BNLfood does not offer, Nestle "would consider also the presence of DHA because DHA would be part also of the mix."  See id.

Also in November 2009, Nestle representatives met with Hawes in the United States; Nestle received samples from BNLfood in March 2010.  Pl. Ex. 95.  By November 2010, Nestle experts had evaluated BNLfood's DHA and ARA products and given a "positive opinion for applications in products."[32]  Pl. Ex. 86 at BNL0006642.  However, the only Nestle unit interested was a dairy business in China; BNLfood had no further contact with Nestle in the United States.  See id.; Pl. Ex. 97 at 374:13-15.

---

positions, and the Nestle employee as new to the United States. ECF No. 84.  This argument is irrelevant to the summary judgment analysis, as the Court must determine whether Martek is entitled to judgment as a matter of law "without weighing the evidence or assessing the witnesses' credibility."  Dennis, 290 F.3d at 645.

[31] BNLfood also discussed with Nestle use of its products in "Growing Up Milks" for children between three and twelve years old.  See Pl. Ex. 91.  This is outside the market at issue in this case.  See supra Part.II.B.1.a.

[32] Although it is not clear, it appears that this evaluation was separate from the samples sent to Nestle in the United States. See ECF No. 82 at 27.

As with the other companies, BNLfood's contact with Nestle simply seemed to evaporate.  However, Nestle did not change its contracts to Martek.  From the record, the assertion that Martek's contracts caused BNLfood's injury regarding Nestle is at best speculative.

BNLfood has not presented any evidence directly from the infant formula manufacturers that explains their reasons for not purchasing from BNLfood.  Further, there is evidence that the manufacturers were concerned with BNLfood's lack of GRAS,[33] clinical testing,[34] its high prices,[35] and the potential allergy effects from the egg-derived products.[36]  BNLfood attempts to rebut these deficiencies in its products by arguing that it is likely to receive GRAS--which has since occurred--and its products are not actually allergenic.  *See* ECF No. 82 at 31-38. Whatever the truth of these arguments, it is the customer's perception of the truth that fueled their decisions, not, for example, whether the products actually can cause allergic reactions.

---

[33] *E.g.*, Def. Ex. 25 at 80:12-13; Def. Ex. 26 at 209:23-210:5; Def. Ex. 30 at 56:20-57:3; Def. Ex 51.

[34] *E.g.*, Def. Ex. 25 at 188:6-189:6; Def. Ex. 31 at 124:17-20.

[35] *E.g.*, Def. Ex. 39 at BNL0011544; Def. Ex 57 at BNL0001196.

[36] *E.g.*, Def. Ex. 6 ¶ 6; Def. Ex. 46 at BNL0028005.

BNLfood also asserts that Martek specifically targeted it for exclusion from the U.S. infant formula market.  ECF No. 82 at 29.  This, too, is unavailing.  The principal evidence on which BNLfood relies is a request in January 2007, for BNLfood to purchase ARA for use in chicken feed; the intent was for the resulting eggs to ultimately be used for ARA and DHA production for infant formula.  *See* Pl. Ex. 98 at MTK-E-0014859.  Martek initially stated that it would not sell to BNLfood for "animal applications."  *Id.* at MTK-E-0014858.  Shortly thereafter, another Martek representative clarified that the use of its ARA in infant formula required a license to the infant formula manufacturer, and thus it could not sell ARA through distributors.  *Id.*  He also acknowledged that BNLfood's end product would compete with Martek's infant formula business, and "[i]t is not in our interest to further the acceptance of egg phospholipid as an alternative ARA ingredient."  *Id.*  Even viewed in the light most favorable to BNLfood, there is nothing in this exchange suggesting that Martek was purposely targeting BNLfood; rather Martek was declining to help a potential competitor create its products.

 BNLfood also relies on several Martek documents about attempts to obtain intelligence on BNLfood's products.  First are emails from April 2009 discussing Martek employees' planned visits to a trade show to possibly obtain samples of

competitors' products.  Pl. Ex. 103.  The emails listed BNLfood

as a competitor, but the Martek employees did not plan anything

specific regarding BNLfood.  *See id.*  Martek did, however,

obtain BNLfood literature from the show.  *See* Pl. Ex. 104.

Second, Martek employees visited BNLfood in June 2009 and

decided to "make an assessment of what sort of threat this is,"

although there is no evidence of further investigation. [37]  *See*

*id.*  This evidence does not suggest that Martek was specifically

targeting BNLfood or trying to exclude it from the U.S. market.

Instead it was trying to determine whether BNLfood was actually

a competitive threat.

From the evidence in the record, BNLfood cannot show that

its injuries were substantially or materially caused by Martek's

actions.[38]  *See Irvin Indus.*, 974 F.2d at 245.  Accordingly, it

cannot show standing, and Martek is entitled to summary

judgment.

---

[37] BNLfood also asserts that Martek stole some of its German
customers.  ECF No. 82 at 30 (*citing* Pl. Ex. 105 at MTK0006641).
BNLfood has not explained, however, how this is relevant to
Martek's actions in the U.S. market.

[38] Martek also asserts that BNLfood SARL lacks prudential
standing because any harm was to its subsidiaries, and not
BNLfood SARL directly.  *See* ECF Nos. 78 at 49, 84 at 20 n.20.
Because the BNLfood does not have antitrust standing, the Court
does not reach the less stringent prudential standing inquiry.

III. Conclusion

For the reasons stated above, the motion for summary judgment will be granted.

_3/28/13_

Date

William D. Quarles, Jr.
United States District Judge